UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DONALD LAGUARDIA,

Defendant.

19 Cr. 893 (LAK)

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

AUDREY STRAUSS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Daniel Loss
Assistant United States Attorney
- Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY .......... 1

I. Summary of Offense Conduct .......... 1

II. Procedural History .......... 5

III. Presentence Investigation Report .......... 5

DISCUSSION .......... 6

I. The Guidelines Calculation .......... 6

II. A Substantial Sentence of Incarceration is Necessary to Reflect the Seriousness of Laguardia's Offense, Afford Adequate Deterrence and Promote Respect for the Law. .. 14

III. Forfeiture and Restitution .......... 16

CONCLUSION .......... 16

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Donald Laguardia, which is scheduled for July 20, 2021. For the reasons set forth below, a substantial sentence of incarceration is appropriate to serve the goals of sentencing enumerated in Section 3553(a), including to reflect the seriousness of Laguardia's criminal conduct, to promote respect for the law and provide just punishment, and to afford adequate deterrence.[1]

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I. Summary of Offense Conduct

Donald Laguardia was the founder and managing principal of L-R Managers, LLC ("L-R Managers"), the investment adviser to the LR Global Frontier Master Fund, Ltd. and its two feeder funds, L.R. Global Frontier Fund, L.P. and L.R. Global Frontier Fund, Ltd. (collectively, the "Frontier Funds"). PSR ¶¶ 11-13.

From 2013 through 2017, Laguardia engaged in a scheme to defraud investors in the Frontier Funds. Laguardia raised approximately $6,445,000 for the Frontier Funds based on material misrepresentations regarding, among other things, how investor funds would be used. *Id.* ¶¶ 16, 32. Specifically, Laguardia marketed the Frontier Funds as a vehicle to invest in "frontier market" companies in Latin America, Central and Eastern Europe, the Middle East, Africa, and Asia. *Id.* ¶ 12. Pursuant to private placement memoranda, Laguardia further represented that L-R Managers would pay for its own "overhead costs and expenses." *Id.* ¶ 18. Contrary to those representations, Laguardia diverted a substantial portion of investments

---

[1] Throughout this memorandum, "PSR" refers to the Final Pre-Sentence Investigation Report dated February 8, 2021; "Dkt." refers to docket entries in this case; and "Tr." refers to the transcript of the trial in this case; and "GX" refers to Government exhibits admitted at trial.

intended for the Frontier Funds to other purposes, including to pay himself and to fund the operations of L-R Managers. *Id.* ¶ 16.

As one example, on January 9, 2013, investor Gavin Wilson signed subscription documents for an $800,000 investment in the Frontier Funds. PSR ¶ 21. Wilson followed Laguardia's instruction to wire his investment to an account belonging to L-R Managers Investments, L.P. ("LRMI"), which was an affiliate of L-R Managers. *Id.* ¶¶ 22-23. That same day, John Schnell, an employee of L-R Managers, sent an email to Laguardia and another employee, relaying that "Gavin's $$ just came in," and asking, "[L]et me know when I can wire it to the Frontier [Funds]." GX 1700. Laguardia responded, "Dont [sic] wire anything yet!" *Id.* In fact, approximately half of Wilson's investment was never transmitted into the Frontier Funds, as Wilson intended. PSR ¶ 24. Instead, between January and March 2013, Laguardia caused approximately $390,000 to be transferred to L-R Managers to pay himself and to fund L-R Managers' business expenses (contrary to the representations in the offering memoranda that L-R Managers would be responsible for its own business expenses). *Id.*

In other instances, investors initially sent their money directly into a Frontier Funds account, but Laguardia subsequently transferred a portion of their investments, without the investors' authorization, to L-R Managers. *See*, *e.g.*, Tr. 90:22-92:14, 139:3-140:1, 176:6-182:24, 293:22-294:20, 299:3-299:19; GX 3001-B; GX 3003-G. From 2013 to 2017, Laguardia directed the transfer of at least approximately $1 million from the Fronter Funds to L-R Managers, which he then used to pay himself approximately $139,000, as well as to subsidize L-R Managers' operating expenses. PSR ¶ 25. In addition to transferring money from the Frontier Funds to L-R Managers directly, in November 2014, Laguardia directed the transfer of $201,500 from the Frontier Funds to a third party on L-R Managers' behalf. *Id.* ¶ 27.

By September 2015, L-R Managers faced substantial financial difficulties. *Id.* ¶ 28. On September 1, 2015, another managing principal at L-R Managers ("Principal-1") emailed Laguardia, and others to discuss the "precarious financial condition" of the firm. *Id.* Principal-1 stated that L-R Managers had been "running on short term (now monthly) financial funding for the past year," had accumulated liabilities to numerous vendors, and had been unable to meet payroll for several months. *Id.* Principal-1 noted: "Now that LR is out of money, burdened with debt, and no prospect of immediate funding, I find it . . . ethically troubling to accept money into the fund when we can no longer support our payroll and mission critical services such as Bloomberg." *Id.*

Notwithstanding Principal-1's email, just a few days later, on September 4, 2015, the Fronter Funds accepted a $2 million investment from a new investor, Christopher Lacroix. *Id.* ¶ 29. Prior to this investment, Laguardia told Lacroix that L-R Managers would bear the start-up costs of the Frontier Funds and that Lacroix would only be responsible for a 1% management fee. *Id.*; Tr. 71:3-72:22. Laguardia told Lacroix, "We're not going to bang you up with startup expenses . . . . You're going to pay 1 percent and only 1 percent." Tr. 71:18-20. Laguardia did not disclose to Lacroix that L-R Managers had been struggling to pay its employees' salaries, or that the Frontier Funds had been paying substantial expenses on behalf of L-R Managers in addition to covering the Frontier Funds' own expenses. PSR ¶ 29; Tr. 74:7-15.

Contrary to Laguardia's representations to Lacroix, by October 2015, mere weeks after Lacroix invested, Laguardia had already used more than 1% of Lacroix's money to pay fund expenses. *See* GX-1150 (reflecting a $36,320 payment to the fund administrator). Additionally, from October 2015 through December 2015, Laguardia withdrew approximately $291,000 from

the Frontier Funds – derived from Lacroix's investment – to pay himself and subsidize the operations of L-R Managers. GX 3001-B; PSR ¶ 30.

Laguardia was a certified public accountant by training. PSR ¶ 88; Tr. 149:3-5. When Laguardia directed transfers from the Frontier Funds to L-R Managers, he caused the transactions to be recorded as receivables due to the Frontier Funds. Tr. 228:21-230:6. However, Laguardia did not disclose to investors such as Lacroix that the Frontier Funds' assets included receivables. Tr. 76:9-23, 428:22-24; PSR ¶ 26. Frontier Fund investor statements that purported to show the net asset value of investors' capital accounts also did not disclose the receivables. *See*, *e.g.*, GX 2324. For example, a capital account statement that Lacroix received from L-R Managers purported to show that, as of December 2016, Lacroix had earned a 9% return on his investment since inception and that his investment was worth $2,183,062. *Id.* This obscured the fact that, in reality, Laguardia had depleted Lacroix's investment to pay for L-R Managers' expenses and other unauthorized purposes. The capital account statement also indicated that Lacroix's management fee was only 1%, thereby concealing that a substantial portion of his money had gone to L-R Managers rather than to frontier market investments. GX 2324; Tr. 89:1-9.

Lacroix made a redemption request in June 2017, but did not receive back any of his $2 million investment. PSR ¶ 31. In total, of the approximately $6,445,000 invested in the Frontier Funds, investors received back only approximately $2,579,240 (including $191,288 paid to certain investors in excess of their principal investment). *Id.* ¶ 34. Approximately $882,486.96 remains in an account held by the Frontier Funds' custodian, but to date has not been distributed to investors. *See* PSR ¶ 118 and 7/11/2021 Letter from Eric Creizman, Esq. to Judge Kaplan (filed under seal).

## II. Procedural History

On December 17, 2019, a grand jury returned Indictment 19 Cr. 893, charging Laguardia with one count of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; one count of investment adviser fraud, in violation of Title 15, United States Code, Section 80b-6 and 80b-17; and one count of wire fraud, in violation of Title 18, United States Code, Section 1343. Laguardia was arrested on December 17, 2019. In November 2020, the jury found Laguardia guilty on all counts following a five-day trial.

## III. Presentence Investigation Report

The Probation Office calculated that Laguardia has a total Guidelines offense level of 31 or 33 (depending on whether the Court applies a two-level enhancement for obstruction of justice): the base offense level is seven (U.S.S.G. § 2B1.1(a)(1)); 18 levels are added because the loss amount resulting from the offenses is more than $3,500,000, but less than $9,500,000 (U.S.S.G. § 2B1.1(b)(1)(J)); two levels are added because the offenses involved sophisticated means (U.S.S.G. § 2B1.1(b)(10); four levels are added because the offense involved a violation of the securities law, and, at the time of the offense, the defendant acted as an investment adviser (U.S.S.G. § 2B1.1(b)(20)(A)(iii). PSR ¶¶ 37, 41-51. The Probation Office defers to the Court as to the applicability of a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. *Id*. ¶ 37. Laguardia has no prior convictions and is in Criminal History Category I. *Id.* ¶¶ 52-55. Accordingly, based on Probation's calculation, Laguardia's advisory Guidelines range is 108 to 135 months' imprisonment, excluding an enhancement for obstruction of justice. PSR ¶ 104. Applying a two-level enhancement for obstruction of justice, Laguardia's advisory Guidelines range would be 135-168 months.

After interviewing Laguardia and preparing its final presentence investigation report for his case, the Probation Office has recommended a term of 80 months' imprisonment. PSR at 38. In making its recommendation, the Probation Office found that Laguardia's motivation was financial gain and that Laguardia committed the instant offense despite having a strong support system in place throughout his adult life. The Probation Office noted that Laguardia was "more concerned about supporting himself than doing right by the investors that trusted him." *Id.* at 40. Considering all of the relevant factors, including Laguardia's familial obligations and lack of criminal history, as well as the need for just punishment and general and specific deterrence, the Probation Department recommended a variance allowing for a sentence of 80 months' imprisonment. *Id.*

## DISCUSSION

### I. The Guidelines Calculation

As the Court well knows, district courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which serves as "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). After determining the applicable Guidelines range, courts consider the seven factors set forth in 18 U.S.C. § 3553(a). *See Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set out in 18 U.S.C. § 3553(a)(2).

Based on an offense level of 33 and a criminal history category I, the applicable Guidelines range is 135-168 months, as set forth above. The defendant disputes (1) the amount of loss; (2) the applicability of a 2-level enhancement for sophisticated means; and (3) the applicability of a 2-level enhancement for obstruction of justice. The defendant contends that the correct offense level is 27, which at criminal history category I would result in a Guidelines

range of 70-87 months' imprisonment. The defendant further argues for a downward departure due to "overlapping" enhancements and for a downward variance with respect to the investment adviser enhancement. For the reasons set forth below, the defendants' arguments are meritless.

**A. Amount of Loss**

Under Section 2B1.1 of the Guidelines, the base offense level is increased by the greater of intended or actual loss caused by the defendant's criminal conduct. U.S.S.G. § 2B1.1 & app. note 3(A). Pursuant to Section 2B1.1(b)(1), the court "need only make a reasonable estimate" of the loss. Here, investors were fraudulently induced to invest approximately $6,445,000 in the Frontier Funds based on the defendant's misrepresentations regarding how their investments would be used. Additionally, prior to the detection of the instant offense, approximately $2,387,953 was returned to investors in the form of redemption payments.[2] The evidence presented at trial was that investors would not have invested in the Frontier Funds had they known that the value of their investment would be depleted through the subsidization of L-R Managers' expenses. *See* Tr. 72:9-17 ("I wouldn't have invested if they were going to start putting all their charges because it would just whittle away the performance . . . .") Accordingly, the Government agrees with the Probation Office's calculation that the loss is equal to $4,057,046.57 (*i.e.*, $6,445,000 minus $2,387,953), which results in an 18-level enhancement.

[2] This excludes $191,288 in redemption payments to certain investors in excess of their principal investments. Such redemptions are not deducted from the loss amount under application note 3(F)(iv) to U.S.S.G. § 2B1.1. While Laguardia asserts that the application is inapplicable because the instant offense does not involve a Ponzi scheme, the application note applies to "fraudulent investment schemes" and is not limited only to Ponzi schemes. Additionally, Laguardia's scheme contained Ponzi-like conduct, as some redemption payments could not have been made without the money that Lacroix invested. *See* PSR ¶ 32.

Laguardia argues that he is entitled to a credit against loss in the amount of $882,486.96, which is the current value of Frontier Fund assets held by the third-party fund custodian. As a result, Laguardia argues for 16-level, rather than an 18-level, enhancement. This argument is meritless. Under application note 3(E)(i) to U.S.S.G. § 2B1.1, only the money or property returned by a defendant to a victim "before the offense was detected" may be credited against the loss amount. Here, while it is possible that the funds held by the custodian may ultimately be returned to investors, there is no assurance of that,[3] and in any event, such return of funds would be years after the detection of the offense. Indeed, investor redemption requests in excess of $2 million have been pending since June 2017, but have not been fulfilled.

Laguardia's argument that the provision of Frontier Fund shares conferred value to the victims is unavailing because, as the evidence at trial showed, Laguardia routinely used the Frontier Funds as a piggybank to access whenever he needed to pay expenses for himself or his management company. For these reasons, the defendant's argument for a $882,486.96 credit against loss should be rejected.

[3] On May 17, 2021, the SEC filed a motion in the parallel civil case seeking to transfer the assets in the Frontier Funds' custody account to the Court Registry Investment System and to appoint a distribution agent to distribute the funds to investors. *SEC* v. *Laguardia*, 19 Civ. 5895, Dkt. 39. Laguardia opposes the SEC's motion on the basis that he ostensibly resigned from any managerial role with respect to the Frontier Funds in July 2017 and thus does not believe he is authorized to effectuate the requested relief. *SEC* v. *Laguardia*, 19 Civ. 5895, Dkt. 41. Meanwhile, Laguardia stated in his June 9, 2021 letter to this Court (Dkt. 103) that Global International Advisors ("GIA") – an entity that has retained Laguardia as a consultant -- is acting with the "enthusiastic support" of the Frontier Funds' largest shareholders to recover, liquidate, and distribute the Frontier Funds' remaining assets to investors. However, the Government was recently informed that the Frontier Funds' largest shareholder (Lacroix) has not consented to GIA's request to act on his behalf, and that GIA is, in fact, seeking to take up to two-thirds of the remaining Frontier Fund assets for GIA's and other professionals' fees and expenses. Accordingly, any benefit that Frontier Fund investors may eventually receive from the assets presently held by the fund custodian is speculative.

**B. Sophisticated Means**

Pursuant to Section 2B.1.(b)(10) of the Guidelines, a two-level enhancement applies because Laguardia's offense involved sophisticated means and Laguardia intentionally engaged in or caused the conduct constituting sophisticated means. Under application note 9(b), "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

Here, both the execution and the concealment of the misappropriation scheme were complex. For example, Laguardia executed his scheme, in part, by directing investor Gavin Wilson to wire his investment deposit, not directly to into a Frontier Funds account as the subscription paperwork contemplated, but into a special bank account for an L-R Managers affiliate called LRMI that was controlled by Laguardia. *See* GX 2350; PSR ¶ ¶ 22-23. This facilitated Laguardia's diversion of Wilson's investment to other uses.

Additionally, Laguardia concealed his depletion of Frontier Fund assets by directing the fund administrator to book receivables due from L-R Managers. The receivables themselves were not disclosed to investors such as Lacroix, *see* Tr. 76:9-23, 428:22-24; PSR ¶ 26, but their inclusion as assets in the Frontier Funds obscured the decline in the NAV that resulted from Laguardia's use of the Frontier Funds to pay L-R Managers' expenses. As a certified public accountant by training, Laguardia himself dictated this receivables practice. Tr. 228:21-230:6

By the time Lacroix made his $2 million subscription to the Frontier Funds in 2015, Laguardia added an additional layer of complexity to the accounting treatment to hide the fact that Lacroix investment was being used to pay for expenses in a manner to contrary to what Laguardia had represented. Specifically, the Frontier Funds had multiple share classes, with Lacroix being a "Class A" investor. As the flow-of-funds analysis presented at trial showed,

Lacroix's investment was used to fund approximately $291,000 in transfers to L-R Managers between October 2015 and December 2015. *See* GX 3001-B. The transfers continued in 2016. PSR ¶ 25. Yet rather than record the transactions in a transparent manner, Laguardia created an accounting fiction that the payments came exclusively out of "Class B." *See* Tr. 428-429, 443-444. In Laguardia's own words, "according to the financial statements, they are using the Class B assets for those transfers." Tr. 450:6-9. Accordingly, Lacroix received capital account statements that purported to show that his $2 million investment had grown substantially despite the fact that (unbeknownst to Lacroix) the investment had been spent in large part on L-R Managers' expenses. S*ee*, *e.g.*, GX 2324. In light of the complexity of the foregoing means of deception, the sophisticated means enhancement is appropriate.

**C. Obstruction of Justice**

A two-level enhancement for obstruction of justice is warranted for Laguardia pursuant to U.S.S.G. § 3C1.1. This enhancement applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instance offense." Pursuant to application note 4(b), perjury can serve as the basis for this enhancement. "In order to enhance a defendant's sentence for obstruction of justice through [perjury at trial], the sentencing court must determine by clear and convincing evidence that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Kelly*, 147 F.3d 172, 178 (2d Cir. 1998) (internal quotations omitted). Here, as set forth below, Laguardia perjured himself through his trial testimony in multiple ways.

First, Laguardia testified that, in 2013, Gavin Wilson's investment was wired to LRMI – an entity affiliated with LR Managers – instead of the Frontier Funds because the Frontier Funds

"could not invest in Bangladesh IPOs" and the wire to LRMI was a "workaround . . . to get Gavin the access he wanted" to Bangladesh. Tr. 456:5-19. Laguardia's uncorroborated testimony was flatly contradicted by other evidence, including Wilson's subscription agreement to the Frontier Funds and email correspondence between Laguardia and Wilson, which demonstrated that Wilson intended to invest $800,000 in the Frontier Funds and that Laguardia proposed the wire to the LRMI account merely as a pass through that would permit Wilson to avoid certain paperwork and invest in the Frontier Funds through LRMI. *See*, *e.g.*, GX 2350, 2305. The jury's verdict reflets that the jury did not find Laguardia's testimony credible as to the purpose of Wilson's wire to LRMI.

Laguardia's argues, misleadingly, in his sentencing brief that "there is no evidence that either Mr. Wilson or his authorized representative for Lauterstein Consulting . . .ever protested upon receiving an account statement from [the fund administrator] that would have only reflected a $400,000 investment in the Fund, and not an $800,000 investment." Dkt. 107 at 39. There is no evidence in the record, however, that Wilson or Lauterstein ever received such a statement or even that such a statement exists. Nor would there be, since the arrangement Laguardia conveniently set up was for Gavin Wilson's investment in the Frontier Funds to be in the name of LRMI.

Second, Laguardia falsely testified as to the substance of his communications with investor Christopher Lacroix before Lacroix invested $2 million in the Frontier Funds in 2015. Laguardia in one instance during his testimony stated that he told Lacroix that L-R Managers would pay only a "portion" of the Frontier Funds' expenses. Tr. 476-477. In another instance, Laguardia testified that he told Lacroix that L-R Manages would merely "try" to help pay the fund expenses. Tr. 428:5-8. These statements were contradicted by the other evidence at trial, including Lacroix's testimony that Laguardia assured him that, apart from a one percent management fee, Lacroix's

investment would not go toward the payment of expenses. Tr. 71:7-72:22. Lacroix testified that Laguardia was "very firm" in this representation. Tr. 72:6-8. The jury's verdict indicates that jury did not find Laguardia's testimony to the contrary credible.

Third, Laguardia falsely testified that John Schnell, an employee of L-R Managers, "never" expressed concerns about the practice of transferring money from the Frontier Funds to L-R Managers. Tr. 426:2-5. Laguardia's testimony was contradicted by Schnell, who testified that he had concerns about the transfer of investors' money from the Frontier Funds to L-R Managers and that he discussed those concerns with Laguardia. Tr. 224:6-25.

Accordingly, the Court should apply a 2-level enhancement for obstruction of justice under Section 3C1.1.

**D. Defendant's "Overlapping" Enhancements Argument**

The Court should reject the defendant's argument for a departure based on the "overlapping" nature of the loss, sophisticated means, and investment adviser enhancements. Each of these enhancements serves a different purpose in the sentencing calculus. Fraud offenses do not necessarily involve investment advisers. The amount of loss, by itself, does not adequately reflect the fiduciary duty that Laguardia breached as an investment adviser or the complex means that Laguardia used to carry out and conceal his scheme. To be sure, these enhancements significantly increase the applicable Guidelines range. But Laguardia is subjected to these enhancements because of the way he chose to commit this instant offense, soliciting millions of dollars through his position as an investment adviser and then misappropriating the investors' funds and trying to cover it all up through complicated accounting. For these reasons, a downward departure is inappropriate.

**E. Defendant's Argument as to Investment Adviser Enhancement**

The Court should reject the defendant's argument to apply a 2-level, rather than 4-level, enhancement for Laguardia's role as an investment adviser. Contrary to Laguardia's assertions, the Sentencing Commission did not go beyond "Congress's directive" in adopting the 4-level investment adviser enhancement. Under the Sarbanes-Oxley Act, Congress not only requested the Sentencing Commission to provide an enhancement for senior corporate officers, as the defendant highlights, but also directed a review of "sentencing guidelines for securities fraud and accounting fraud" more generally and requested that the Sentencing Commission "ensure that the sentencing guidelines and policy statements reflect the serious nature of securities, pension, and accounting fraud and the need for aggressive and appropriate law enforcement action to prevent such offenses," as well as "assure that the guidelines adequately meet the purposes of sentencing as set forth in section 3553 (a)(2) of title 18, United States Code." *See* Sarbanes-Oxley Act of 2002, P.L. 107-204 §1104.

Moreover, in adopting the investment adviser enhancement, the Sentencing Commission concluded that the "four level enhancement appropriately reflects the culpability of offenders who occupy . . . positions [as investment advisers] and who are subject to heightened fiduciary duties imposed by securities law . . . similar to duties imposed on officers and directors of publicly traded corporations." U.S.S.G. app. C, vol. II, at 367.

In short, there is a strongly policy rationale for the 4-level investment adviser enhancement. The enhancement is routinely applied, and no Guidelines-specific variance is warranted here.

**II. A Substantial Sentence of Incarceration is Necessary to Reflect the Seriousness of Laguardia's Offense, Afford Adequate Deterrence and Promote Respect for the Law.**

As set forth below, a substantial sentence of incarceration would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. See 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

Unlike many defendants who come before this Court, Laguardia grew up with the advantages of a middle-class lifestyle and a higher education. PSR ¶¶ 62, 87-88. After obtaining a bachelor's degree in public accounting, a certified public accountant license, and attending a master's program in international finance, Laguardia went on to make more than $1 million a year. *Id.* ¶¶ 87-88, 93. As the Probation Office noted, Laguardia has also enjoyed a strong support system throughout his adult life. *Id.* at 40. And yet despite all these advantages, Laguardia chose to abuse his position of trust as an investment adviser and to defraud investors, including even someone Laguardia considered a "very close friend" of 20 years (Gavin Wilson). Tr. 452:19-21.

To carry out and try to cover up his scheme, Laguardia put his specialized skills and training to use, directing that receivables be booked in the Frontier Funds (so as to make it appear that the net asset value of the Frontier Funds was not impacted by his misappropriation of fund assets) and then failing to disclose the receivable practice to investors (so as to leave them under the false impression that their money had gone to frontier market investments, and not simply to L-R Managers in exchange for an IOU. Laguardia then lied when taking the witness stand at trial in attempt to dodge responsibility. Especially when viewed against this backdrop, a substantial

sentence of incarceration is necessary to serve the purposes of sentencing set forth in Section 3553(a).

The seriousness of the defendant's offense cannot be disputed. He engaged in a deliberate fraud scheme by abusing his position as an investment adviser to dupe his close friend and other investors into "investing" millions of dollars in an investment fund that he raided, as needed, for other purposes. His conduct spanned several years and involved lies and misrepresentations to multiple investors, as well as a sophisticated effort to cover up his misappropriation of their funds through accounting mechanisms like receivables. The scope, duration, and financial extent of the defendant's crime, as well as the violation of special trust inherent in his fraud, all call for a substantial sentence of incarceration.

Additionally, as the Probation Office concluded, specific deterrence is a concern here in light of the financial motivation for Laguardia's crimes. PSR at 39-40. Laguardia's response to his subordinate employee, John Schnell, after Schnell raised concerns about the transfer of investor money to Laguardia's management company and Laguardia's use of the money for personal expenditures is telling in this regard. Laguardia's reply to Schnell was, "I need to live." Tr. 225:1-5. For a man who earned between hundreds of thousands of dollars and more than $1 million per year for much of his career (*see* PSR ¶ 93), to be so cavalier about his betrayal of the trust investors put in him speaks volumes about the need for specific deterrence.

Finally, a substantial sentence of incarceration is needed to deter similarly situated individuals from engaging in fraudulent conduct. It is generally well-settled that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). Investment schemes

such as Laguardia's can be difficult to detect. Accordingly, it is especially important to send a message that this type of fraud will not be tolerated, notwithstanding the defendant's professed hopes that everything would work out in the end.

### III. Forfeiture and Restitution

The Government seeks forfeiture in the amount of $2,571,500, which represents the Government's calculation of the total amount of Frontier Fund assets that Laguardia misappropriated through transfers to himself and to L-R Managers, which he controlled.

The Government seeks restitution in the amount of $4,039,872.46,[4] less any amounts that may be distributed to victims from the assets presently held by the fund custodian.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial sentence of imprisonment would be reasonable and just in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: /s/
Daniel Loss
Assistant United States Attorney
Southern District of New York

[4] This figure is calculated based on the loss amount of $4,057,046.57, less a $17,174.11 payment from Laguardia to a victim in 2019.